# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| SANDRA PARENT, in her capacity as | ) | |
| Personal Representative of the ESTATE | ) | |
| OF NEIL BEGIN | ) | |
| | ) | |
| Plaintiff, | ) | Docket no. 1:11-cv-295-GZS |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. CUSTOMS AND BORDER | ) | |
| PROTECTION, ET AL., | ) | |
| | ) | |
| Defendants. | | |

## ORDER ON MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

Before the Court is Defendants' combined Motion to Dismiss and for Summary Judgment (ECF No. 28) on all counts contained in Plaintiff's Complaint (ECF No. 1). For reasons explained herein, the Court GRANTS the Motion.

## I.     LEGAL STANDARD

Defendants' Motion asks the Court to dismiss some of Plaintiff's claims and award Defendants summary judgment as to others. Pursuant to Federal Rule of Civil Procedure 12(d), a motion to dismiss under Rule 12(b)(6) must be treated as one for summary judgment under Rule 56 when matters outside the pleadings are presented to the Court. Accordingly, the Court sets forth the Rule 56 summary judgment standard.

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "[T]he mere existence of *some* alleged

factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).  An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248. A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law."  Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993) (citing Anderson, 477 U.S. at 248) (additional citation omitted).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.  Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."  Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); see also Fed. R. Civ. P. 56(e). "Mere allegations, or conjecture unsupported in the record, are insufficient."  Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (internal citations and quotations omitted); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation.") (internal citations omitted).  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving

2

party." In re Spigel, 260 F.3d 27, 31 (1st Cir. 2001) (quoting In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993)).

## II.    FACTUAL BACKGROUND

Plaintiff Sandra Parent brings this case on behalf of the estate of her longtime partner, Neil Begin, against the following Defendants: the State of Maine, U.S. Customs and Border Protection ("CBP"), Maine State Trooper Robert Flynn, CBP Agent Robert Kipler, and CBP Agent Rick Romann (collectively, "Defendants").[1]   On April 23, 2010, Begin sustained numerous gunshot wounds during a standoff with Trooper Flynn, CBP Agent Kipler, and CBP Agent Romann (collectively, "the officers") at his residence.  Begin died of those wounds the next day, April 24, 2010.

### A.    Events Preceding the Standoff

Neil Begin lived with Sandra Parent, his partner of thirty years; their twenty-four year old son, Jesse; and Jesse's girlfriend, Erin, in Cyr Plantation, Maine, just a few miles from the Canadian border.  Begin and Trooper Flynn first encountered each other on the evening of Wednesday April 21, 2010, three days before the standoff, when Flynn arrived at Begin's residence in response to a complaint that local teenagers were harassing Jesse.  Begin and Jesse explained the nature of the teenagers' harassment, but at some point the discussion between Begin and Flynn turned heated, as Begin complained to Flynn that the police were doing nothing to help prevent the teenagers from harassing Jesse.  Ultimately, Flynn left the residence following this argument.

---

[1] For the purposes of Counts II and III – the Maine Civil Rights Act and common law battery claims – CBP Agents Kipler and Roman have been replaced as Defendants by the United States.  (See Order Granting Motion to Substitute Party (ECF No. 27).)

Flynn returned to Begin's residence the next evening, Thursday April 22, 2010, in response to another complaint that local teenagers were harassing Jesse.  Flynn met with Sandra and Jesse on their front porch, and Sandra and Jesse reported that a neighbor had driven by their property and had thrown a rock at their car.  Flynn searched for the rock, but was unable to locate it.  Begin remained inside the residence during Flynn's visit, and the two men did not see each other.   Apparently, Begin did not want to speak with Flynn because of their heated confrontation the previous evening.  Flynn departed the residence at approximately 10 p.m.

Approximately three or four hours after Trooper Flynn left the Begin residence, Begin and his son Jesse got into a heated confrontation, which was fueled by the fact that Begin had been drinking that evening.  During the argument Begin threatened Jesse by pointing a .30-06 caliber rifle directly at him.  Begin also challenged Jesse to a fight.[2]  Jesse retreated into his bedroom, where his girlfriend Erin was located.  Jesse waited in his bedroom with Erin and soon heard the sounds of his mother and father arguing, which included Begin calling Sandra a "slut." (See Transcript of Interview with Jesse Parent, Erin Hannon, and Sandra Parent at 6 (ECF No. 29-1).)  Jesse went into the living room to protect his mother, and Jesse and Begin started arguing again.  During the argument Begin threatened to kill Jesse, at one point saying:  "I'll shoot you you son of a bitch."  (See id. at 6.)  Begin also called Jesse a "narc," suggesting that Jesse would call the police on Begin because he had threatened to kill Jesse, and demanded that Jesse move out of the house.  (See id. at 5, 11.)

Upon hearing Begin's threat to kill Jesse, Erin left the bedroom and walked into the living room, where Begin was pointing his loaded gun at Jesse.  Sandra stepped in front of Jesse to shield him and Begin warned her against standing in front of Jesse because he would "blow both your … legs off right now."  (See id. at 9.)  Begin then turned, pointed the gun at Erin, and

---

[2] According to Jesse, Begin was a professional kick boxer.  (See Transcript of Interview at 5.)

4

told her not to move.  (See id. at 7, 9.)  Jesse had seen Begin shoot the gun previously and later reported to Flynn that the gun could "definitely … do some damage."  (See id. at 10.)

Trying to defuse the situation, Sandra suggested that Jesse go to his bedroom, and Jesse did.  Jesse tried to keep himself busy by rolling cigarettes.  Throughout the remainder of the night Begin would go in and out of Jesse's room, at one point apologizing to Jesse, although Jesse was not receptive to the apology.[3]  Jesse eventually fell asleep, but was woken up at approximately 9 a.m. by his mother.  Based on past experiences with his father's drinking, Jesse assumed that Begin would wake up and apologize for his behavior from the night before.  On the morning of Friday April 23, however, Begin demanded that everyone get out of the house immediately – without taking any belongings.  Begin soon reconsidered, and asked Sandra to stay, but she refused.  As Jesse, Sandra, and Erin were in the process of leaving, Begin grabbed Jesse by the throat, threw him against the wall, and said that he was going to kill him.  Sandra got in between the two men, grabbed Begin's hands, and separated Begin from Jesse.  Begin also threatened to shoot their dog if Jesse tried to take the dog with him as he left.  Jesse called his grandmother and asked her to call the police.  Soon thereafter, Jesse, Sandra, and Erin arrived at Sandra's mother's apartment in Van Buren, Maine, where Trooper Flynn met and interviewed them.  During that interview, Jesse reported that Begin had in his possession a .30-06 caliber rifle, which had been loaded with one bullet either before or during the Thursday night confrontation.  (See id. at 1.)  Jesse also informed Flynn that Begin had been insulting Flynn and expressing his anger toward Flynn.

---

[3] Begin also told Jesse that he was twenty-four years old and that he had to leave the house.  Jesse responded by saying that he was disabled, that he was not permitted to live alone, and that he would have to wait a few days until he received his disability check before he could afford to live somewhere else, an answer that apparently had no impact on Begin.  (See Transcript of Interview at 6.)

After Jesse, Sandra, and Erin recounted their story to Trooper Flynn, Flynn explained to Sandra that he would be arresting Begin for assaulting Jesse and for threatening to kill the three of them with his rifle. Sandra told Flynn that there was still one bullet in Begin's rifle and that she was worried that Begin might use it on himself. Flynn told Sandra that he would keep her apprised of everything. Sandra added that she and Begin had been under a lot of stress and that they had not been sleeping well because of the teenagers driving by their house, throwing rocks, and harassing Jesse. Sandra also told Flynn that Begin would be home alone and that he had the gun with him in the living room. Jesse expressed hope that both he and his father would avoid going to jail because of their argument.

When Flynn left the apartment in Van Buren he was approximately one hundred yards from the U.S.-Canada border and a U.S. border station. U.S. Customs and Border Patrol agents Rick Romann and Robert Kipler heard over their radio that Trooper Flynn was close by, and they drove to his location to see if they could provide Flynn with assistance.[4]  Flynn, who knew Agents Kipler and Romann by appearance but had never spoken with them, stated that he could use some backup in executing an arrest. Flynn also informed Kipler and Romann that the suspect, Begin, had threatened another person and that he may be in possession of a high-powered rifle. Kipler and Romann agreed to assist Flynn and followed behind Flynn's vehicle as he proceeded to Begin's residence. En route to the Begin residence Flynn pulled over and called Assistant District Attorney John Pluto to discuss what charges were appropriate for Begin. Following Flynn's conversation with Pluto, the officers proceeded to the Begin residence.

---

[4] The officers contend that this is common practice due to the limited number of state law enforcement personnel in the area.

### B.      The Officers

Trooper Flynn received formal training at Maine's State Police Academy.  As of April 2010, he had been with the Maine State Police for more than twelve years.  In addition, Flynn was an accident re-construction specialist with the State Police and a trained grenadier with a chemical weapons disbursement for riot control purposes.

As of April 23, 2010, Agent Kipler was employed by U.S. Customs and Border Protection and, since November 2008, he had been stationed in Van Buren, Maine.  His primary duties in that position included detection of terrorists as well as detection, deterrence, and interdiction of narcotics and narcotics smugglers attempting to cross the border.  Prior to the events at issue in this case, Agent Kipler had attended two federal law enforcement training academies – one for the Border Patrol and another for Office of Field Operations (formerly Customs).  Kipler also had attended numerous training sessions concerning the use of firearms. Kipler qualified with both of his firearms four times per year, and had completed a qualification approximately one month before the shooting of Neil Begin.  As a federal law enforcement officer, Kipler was authorized to make arrests and use deadly force when necessary and appropriate.  On April 23, 2010, Kipler carried two firearms – an H & K P2000, .40 caliber semi-automatic handgun holding thirteen rounds and a Colt M4 semi-automatic .223 caliber patrol rifle holding thirty rounds of ammunition.  Kipler was dressed in his green Border Patrol uniform and was wearing his bulletproof ballistic vest.

As of April 23, 2010, Agent Rick Romann was employed by the CBP.  From 2006 to 2009 he worked on a part-time basis for the Van Buren Police Department, and from February to June 2009 he attended the Border Patrol academy.  Romann had also attended the one-hundred hour training course for reserve officers.  On the morning of April 23, 2010, Romann was a

Border Patrol Agent Intern on probationary status.  He was dressed in a green Border Patrol uniform and carried an H & K P2000, .40 caliber semi-automatic handgun holding thirteen rounds of ammunition.  Romann donned his bulletproof ballistic vest before arriving at Begin's residence.

### C.     The Shooting

The officers – Flynn, Kipler, and Romann – arrived at Begin's residence at approximately 11 a.m. on Friday, April 23, 2010.  Flynn's patrol car was equipped with a video camera and audio recording system that recorded what transpired at the Begin residence.  (See ECF No. 29-7.)  However, the video camera was pointed away from the Begin residence and the recording captures only the road in front of the Begin residence.  The audio recording, on the other hand, provides real-time audio of what transpired following the officers' arrival at the Begin residence.  Flynn exited his patrol car and approached the front door of the residence, which appeared to the officers to be a modified trailer.  Agents Kipler and Romann exited their vehicle, each took hold of their respective firearms, and they took positions on either side of Flynn in order to cover Flynn in case of gunfire.  Agent Kipler was positioned approximately fifteen to twenty feet to Flynn's left and Agent Romann was positioned on Flynn's right.  When Flynn reached the front door of the residence he announced his presence and told Begin to come to the door without his gun, open the door, and leave his gun in the house.  Begin came to the front door, and Flynn could see the top of Begin's face through four small windows along the top of the door.  Flynn directed Begin to show his hands in the window, and he repeated this command several times before warning:  "I will shoot you through that door.  Open that door. Show me your hands right now."  (Audio Recording Transcript at 1 (ECF No. 29-5).)  Flynn heard the sound of Begin putting the gun down and he saw Begin show one hand through the

window.  Flynn then told Begin to leave the gun down, open the door, and show his hands.

Flynn repeated his demand that Begin show his hands and then said, "I'm not going to tell you

again."  (Id.)  A few seconds later, Flynn heard Begin grab the gun and run to the back of the

house.  Flynn called out to Kipler and Romann that Begin had gone to the back of the house, and

Agent Kipler ran outside and around to the back of the residence in order to cut off any escape

attempt.

      Flynn forced the front door open and entered the living room; Begin was at the opposite

end of a hallway to the left as Flynn entered the front door.[5]  Agent Kipler observed no activity

behind the residence, so he went back to the front door and re-entered the residence.  Shortly

after re-entering the residence Flynn and the agents heard a sound, which they believed was the

racking of a gun.  Agent Kipler believed that Begin's rifle could penetrate walls and body armor.

Flynn called out twice, demanding that Begin drop the gun, and then yelled:  "I heard you rack

that son of a bitch, don't you dare."[6]  (Id.)  Because it was dark in the house, Flynn pointed his

flashlight down the hallway toward Begin, and he could see that Begin held a gun in his hand.

Flynn called out for Begin to put down the gun and come out into the hallway.  Begin asked

why, and Flynn responded, "You are under arrest."  (Id. at 2.)  Flynn called out again for Begin

to put down his gun.  Begin asked:  "Why?"   Flynn replied:  "You threatened your wife and kid

last night with that gun.  Put it down now."  Begin denied threatening them.  Flynn yelled:  "Put

it down.  I will shoot you…. move that hand again I will shoot you.  Am I understood?  Am I

---

[5] Plaintiff argues that the officers started shooting as soon as they entered the residence.  This argument is not supported by the factual record.  To the contrary, the audio/video recording (see ECF No. 29-7) as well as the written transcript of the audio recording (see ECF No. 29-5), establishes that the officers did not start shooting as soon as they entered the residence.  See Asociacion De Periodistas De Puerto Rico v. Mueller, 680 F.3d 70, 80 (1st Cir. 2012) (discounting plaintiffs' version of events because contemporaneous video recordings of the events in question "bear out key portions of the [defendants'] version of events").

[6] Plaintiff contends that the audio recording of the standoff does not include the sound of Begin "racking" his rifle, and that this creates a trialworthy issue of fact.  Even assuming the evidence regarding the "racking" of the rifle is disputed, it is undisputed that the officers believed Begin racked his rifle.

understood?"  Begin asked that the officers "please get out of my house."  To which Flynn replied, "That's not going to happen."  (Id.)

At some point Flynn repositioned himself within the living room, and Agent Kipler positioned himself behind Flynn's left shoulder.  Flynn continued yelling across the hallway to Begin:  "I'm not going to tell you again … put the gun down.  Put the gun down."  Flynn saw Begin place both hands on the rifle, and said:  "Put it down, get your hands off of it.  There's no need to die here today."  Flynn repeated:  "There's no need to die here today."  Flynn then saw Begin, with both hands on his gun, starting to turn in Flynn's direction, and Flynn fired at Begin.  Agent Kipler then fired several rounds at Begin with his patrol rifle.

Begin went behind the wall and Flynn lost sight of him.  Soon after, Begin popped out from behind the wall and Flynn could see Begin holding his gun, although Flynn could only see Begin's upper torso.  Flynn and Agent Kipler both fired again at Begin, who fell to the floor out of view of the officers.  Begin called out:  "You're killing me man."  Flynn replied:  "That's right," and called out to Begin to come out with his hands up:  "We will not shoot you if you have your hands in the air with no weapon."  The officers could see part of Begin's body, but they could see only one of his hands.  Flynn continued to call out for Begin to show both of his hands and said that the officers would come into the room where Begin was located and get him medical attention once they could see both of his hands.  After several minutes the officers reached Begin and found him lying on the ground close to two guns:  his rifle – bolt open – and a shotgun.  Paramedics eventually arrived at the scene and took Begin to a nearby hospital.[7]  He died the next day.

---

[7] Plaintiff asserts that although the shooting occurred around 11:05 a.m., Begin did not receive medical assistance until he arrived at the hospital at 12:10 p.m.  (See Plaintiff's Summary Judgment Memorandum at 7 (ECF No. 36).)  Based on this assertion, Plaintiff states that:  "The delay in providing [Begin] emergency care was serious and questionable."  Plaintiff does not contend, however, that this supposed delay constitutes a constitutional violation

## III.    DISCUSSION

Plaintiff's Complaint contains three remaining claims against Defendants:  violation of 42 U.S.C. § 1983 (Count I); violation of Maine Civil Rights Act, 5 M.R.S.A. § 4682 (Count II)[8]; and common law battery (Count III).[9]   Defendants have moved for dismissal or summary judgment on all claims.  Plaintiff contends that dismissal is inappropriate and that trialworthy issues of material fact exist, which renders any award of summary judgment premature.  The Court addresses in turn each of Plaintiff's remaining claims.

### A.     42 U.S.C. § 1983 (Count I)

Count I of Plaintiff's Complaint alleges violations of 42 U.S.C. § 1983 by all Defendants, claiming that they violated Neil Begin's rights under the Second, Fourth, and Fourteenth Amendments.  Defendants respond with three primary arguments – first, Plaintiff's § 1983 claim against the State of Maine and the CBP must be dismissed because claims against government agencies and states are not permitted under § 1983; second, Plaintiff fails to state a claim for violations of the Second and Fourteenth Amendments; and third, the officers are entitled to qualified immunity on Plaintiff's Fourth Amendment claims.  The court addresses each argument in turn.

---

that entitles her to recovery under § 1983.  The Court agrees.  Assuming there was a delay, such a delay does not impact the Court's consideration of Plaintiff's claims.

[8] The Court need not separately discuss the Maine Civil Rights Act ("MCRA") claim as the Court's disposition of the § 1983 claim (Count I) also disposes of the MCRA claim (Count II).  See Forbis v. Portland, 270 F. Supp. 2d 57, 61 (D. Me. 2003) ("The disposition of the federal claim controls the plaintiff's claim under the Maine Civil Rights Act, 5 M.R.S.A. § 4682, because the latter is patterned on 42 U.S.C. § 1983."); see also Hegarty v. Somerset County, 848 F. Supp. 257, 269 (D. Me. 1994) ("The same qualified immunity analysis applies under the Maine Civil Rights Act as under § 1983."); Jennes v. Nickerson, 637 A.2d 1152, 1159 (Me. 1994) ("Having found the Officers immune from the section 1983 claims, we also find them immune from claims under the MCRA.").

[9] Plaintiff's Complaint originally included a claim for violation of Title II of the Americans with Disabilities Act (Count IV), but Plaintiff has withdrawn her ADA claim.  (See Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss and for Summary Judgment at 20 (ECF No. 36).)

1.      Claims Against the State of Maine and CBP

Plaintiff's Complaint alleges that the State of Maine, on behalf of the Maine State Police, and the CBP violated Neil Begin's Second, Fourth, and Fourteenth Amendment rights.  Plaintiff additionally claims that the policies and customs of the Maine State Police and CPB caused the violations of Begin's constitutional rights and that these two Defendants inadequately hired, trained, managed, and supervised the individual Defendants – namely, Trooper Flynn, Agent Kipler, and Agent Romann.  Defendants contend that Plaintiff's § 1983 claims against the State of Maine and CBP should be dismissed because § 1983 does not permit claims against federal agencies or states.  With regard to the CPB, Defendants contend that Plaintiff's § 1983 claim against the CBP should be presented as a claim under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), but that even under Bivens Plaintiff's claim fails.  Defendants are correct.

Plaintiff's § 1983 claim against the State of Maine fails because, as the Supreme Court has established, a state cannot be sued for money damages in a § 1983 action.  See Will v. Michigan Dept. of State Police, 491 U.S. 58, 66 (1989); Coggeshall v. Massachusetts Bd. of Registration of Psychologists, 604 F.3d 658, 662 (1st Cir. 2010).  As the Maine State Police are an arm of the state government, they enjoy "Eleventh Amendment immunity from suits for money damages brought in federal court, absent, consent, waiver, or the like."  See Coggeshall, 604 F.3d at 662; see also Will, 491 U.S. at 71 ("Section 1983 ... does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties.").  Maine has neither consented to be sued for damages in federal court in the circumstances of this case nor waived its Eleventh Amendment immunity here.  Nor has Plaintiff cited any law to support her argument that her § 1983 claims against the State Police should survive.

Consequently, that immunity demands the dismissal of the damages claim against the State Police.

As for Plaintiff's claim against the CBP, Plaintiff's claim should have been brought under Bivens, and not under § 1983.  As the First Circuit has stated, in the absence of a specific statutory authorization, "the only way in which a suit for damages arising out of constitutional violations attributable to federal action may be brought is under the [Bivens] doctrine."  Tapia-Tapia v. Potter, 322 F.3d 742, 746 (1st Cir. 2003) (citing Bivens, 403 U.S. 388).  Even if the Court construes Plaintiff's claim against the CBP as a Bivens claim, the claims fails because "the Supreme Court has refused to recognize a Bivens remedy against federal agencies."  Id. (citing F.D.I.C. v. Meyer, 510 U.S. 471, 484-86 (1994)).  Accordingly, Plaintiff's § 1983 claims against the CBP also must fail.

### 2.   Second and Fourteenth Amendment Claims

Plaintiff seeks relief under § 1983 based on allegations that Defendants violated Neil Begin's Second and Fourteen Amendment rights.  Defendants contend that they are entitled to dismissal of these claims because the instant case is a case concerning the use of excessive force and excessive force cases are to be handled exclusively under the Fourth Amendment.

With regard to the alleged Second Amendment violation, the undisputed facts establish that on April 23, 2010 Neil Begin was using a rifle to threaten the use of deadly force against a state trooper and CBP agents.[10]  Such use violates Maine law.  See Norton v. City of South Portland, 831 F. Supp. 2d 340, 362 (D. Me. 2011) (citing 17-A M.R.S.A. § 110).  The Second Amendment does not protect such an unlawful use of guns.  Cf. District of Columbia v. Heller,

---

[10] Plaintiff contends that Begin was not threatening to use deadly force during the standoff.  The factual record, however, conclusively establishes that the officers reasonably believed that Begin posed a significant threat of death or serious physical injury.  See infra III.A.3.

554 U.S. 570, 626-27 (2008) (recognizing that "the right secured by the Second Amendment is not unlimited").  In short, the Court cannot find a trialworthy issue with respect to Begin's lawful possession of guns in the moments before he was shot.  Therefore, on the record presented, the Court finds no violation of Neil Begin's Second Amendment rights.

With regard to Plaintiff's Fourteenth Amendment allegations, Defendants are correct that the excessive force claim should be analyzed under the Fourth Amendment and not under the Fourteenth Amendment.  See Norton, 831 F. Supp. 2d at 361 n.16 (citing Estate of Bennett v. Wainwright, 548 F.3d 155, 163-67 (1st Cir. 2008)); see also Graham v. Connor, 490 U.S. 386, 395 (1989) ("*[A]ll* claims that law enforcement officers have used excessive force – deadly or not – in the course of ... [the] 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach.") (emphasis in original).

In short, the Court concludes that Plaintiff's § 1983 claims alleging violations of the Second and Fourteenth Amendments fail as a matter of law.

### 3.    Fourth Amendment Claims Against the Individual Officers

Plaintiff's remaining § 1983 claim alleges that Trooper Flynn, Agent Romann, and Agent Kipler violated Begin's Fourth Amendment rights by making a warrantless, forcible entry into Begin's residence in an attempt to arrest him and by using deadly force against him.[11]  Flynn, Romann, and Kipler contend that they each are entitled to summary judgment on qualified immunity grounds.

---

[11] With regard to Agents Romann and Kipler, the Court proceeds under a Bivens analysis, as the Agents are federal employees liable under Bivens but not under § 1983.

a)       Qualified Immunity

The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal citations omitted).  As the Supreme Court has stated, "[q]ualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id.  Under the qualified immunity analysis, the Court asks "whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right and whether the right was clearly established at the time of the violation." Asociacion De Periodistas De Puerto Rico v. Mueller, 680 F.3d 70, 80 (1st Cir. 2012) (internal citations omitted).  "A right is clearly established if it would be plain to a reasonable officer that his conduct was unlawful in the particular factual context that he faced." Id. at 80-81 (internal citations omitted).  The Court need not follow the steps of the qualified immunity analysis sequentially, and therefore it focuses on whether a reasonable officer would have known that his conduct was unlawful. See id. at 81.

b)       Warrantless, Forcible Entry

Plaintiff contends that the officers violated Begin's Fourth Amendment rights by making a warrantless, forcible entry into Begin's residence in an attempt to arrest him without probable cause.  Defendants dispute that the entry amounted to a Fourth Amendment violation, contending that it was justified by exigent circumstances and probable cause.

"Probable cause for an arrest exists when the arresting officer, acting upon apparently trustworthy information, reasonably concludes that a crime has been (or is about to be)

15

committed and that the putative arrestee likely is one of the perpetrators." Acosta v. Ames Department Stores, Inc., 386 F.3d 5, 9 (1st Cir. 2004). Courts use an objective standard when determining the existence of probable cause, focusing on the likelihood of criminal activity and considering the totality of the extant circumstances. See id. (internal citations omitted). Considering the totality of the circumstances here, probable cause was established during Trooper Flynn's conversation with Sandra, Jesse, and Erin on the morning of April 23, 2010. During the conversation, Sandra, Jesse, and Erin reported to Trooper Flynn that Begin had pointed a loaded rifle at each of them and, in no uncertain terms, threatened to kill them.[12] Begin's conduct potentially violated three Maine criminal statutes – criminal threatening with a dangerous weapon, 17-A M.R.S.A. § 209(1) ("intentionally or knowingly plac[ing] another person in fear of imminent bodily injury"); terrorizing, 17-A M.R.S.A. § 210 ("communicat[ing] to any person a threat to commit or to cause to be committed a crime of violence dangerous to human life"); and reckless conduct, 17-A M.R.S.A. § 211(1) ("recklessly creat[ing] a substantial risk of serious bodily injury to another person").[13]

With respect to the officers' warrantless entry, it is clearly established law that a warrantless entry into a home without consent is considered to be a presumptively unreasonable seizure. See Estate of Bennett v. Wainwright, 548 F.3d 155, 169 (1st Cir. 2008) (citing McCabe v. Life-Line Ambulance Serv., Inc., 77 F.3d 540, 544 (1st Cir. 1996)). However, such an entry

---

[12] As Defendants correctly point out, for the purpose of the qualified immunity analysis Agents Kipler and Romann were entitled to rely on the information provided by Trooper Flynn concerning Begin. See Solis-Alarcon v. United States, 662 F.3d 577, 581 (1st Cir. 2011) ("where law enforcement authorities are cooperating in an investigation … the knowledge of one is presumed shared by all") (internal citations and quotations omitted).

[13] Even if the officers lacked probable cause, they would be entitled to qualified immunity because, in the context of a warrantless arrest, officers are entitled to qualified immunity "so long as the presence of probable cause is at least arguable." Glik v. Cunniffe, 655 F.3d 78, 88 (1st Cir. 2011) (quoting Ricci v. Urso, 974 F.2d 5, 7 (1st Cir. 1992)). Based on the extent circumstances of this case, the presence of probable cause is, at the very least, arguable. In this case, the Court concludes the officers had the requisite probable cause. Alternatively, even if the Court were to find that probable cause was lacking, the officers would still be entitled to qualified immunity.

may not be unreasonable "where the government can demonstrate, in addition to probable cause, the existence of exigent circumstances." Id. The exigent circumstances exception attaches "where officers reasonably believe that there is a compelling need for immediate action that 'will not brook the delay of obtaining a warrant.'" Id. (quoting United States v. Samboy, 433 F.3d 154, 158 (1st Cir. 2005) (internal quotations and citations omitted)). Such circumstances exist, for example, where there is a need to prevent a suspect's escape or an "imminent threat to the life or safety of" the public, the officers, or the suspect himself. See Minnesota v. Olson, 495 U.S. 91, 100 (1990); Estate of Bennett, 548 F.3d at 169 (internal citations and quotation omitted).

The officers contend that they faced exigent circumstances justifying a warrantless entry. Specifically, the officers contend that Begin presented an imminent threat to their safety because he was carrying what they believed to be a loaded, high-powered rifle and because Begin refused to drop the gun and show the officers his hands even after Trooper Flynn's repeatedly called out to Begin that he was under arrest and that he must drop his weapon and show his hands. The officers further contend that exigent circumstances existed because they reasonably believed that Begin was attempting to escape when he turned away from the front door and proceeded to the back of the residence. Plaintiff responds that no exigent circumstances existed – Begin was not attempting to escape and he presented no imminent threat to the life or safety of the officers – and therefore the warrantless entry violated Begin's Fourth Amendment rights.

The objective facts of this case, known to the officers at the relevant time, make clear that the officers had reasonable grounds to believe that Begin presented a threat of imminent and substantial physical harm to the officers and that Begin might escape. At the time the officers arrived on the scene, they knew that Begin had threatened to kill both his longtime partner (Sandra), his son (Jesse), and his son's girlfriend (Erin). In fact, Trooper Flynn knew that Begin

17

had threatened Jesse in part because Begin believed that Jesse might alert the police about his behavior.  Flynn also knew that Begin had been insulting him the night before and that Begin had been expressing anger toward Flynn in his arguments with Jesse.  The officers also had reason to believe that Begin was armed with a high-powered rifle and that the rifle was loaded with at least one bullet, which, they believed, had the ability to strike them through the wall or the agents' bulletproof vests.  Moreover, shortly after Begin spoke with Flynn from behind the closed front door, Begin turned away from the door and ran towards the back of the house with his gun in hand.[14]  A reasonable officer confronted with similar circumstances could have believed that Begin presented an imminent threat of dangerous behavior or that he presented a threat of escape.[15]  Additionally, "a reasonable officer under the circumstances could have reasonably believed that waiting was not a good idea," and that entering the residence without first obtaining a warrant or express consent was necessary to prevent injury to the officers.  Estate of Bennett, 548 F.3d at 169 (internal citations and quotation omitted).  Ultimately, the circumstances confronting the officers provided "substantial grounds for the officers to have concluded they had legitimate justification under the law for acting as they did."  Id. (internal citations and quotations omitted).  Thus, even if the officers were mistaken in their belief – that is, even if their entry into the residence was unreasonable as a matter of substantive Fourth Amendment

---

[14] Plaintiff contends that there is a trialworthy factual dispute concerning whether or not Begin actually had a gun in his right hand as he proceeded to the back of the house.  Plaintiff contends that Begin could not use his right hand and therefore that it would have been impossible for him to hold a rifle in his right hand as suggested by Trooper Flynn.  The Court, however, concludes that there is no trialworthy issue of fact because the real-time audio recording of the incident establishes that the officers clearly expressed a reasonable belief that Begin was holding a gun in his hand as he left the front door and proceeded to the back of the house.

[15] Plaintiff's contention that Begin presented no threat of escape because the residence has only one entrance simply does not hold water.  First, the officers had no reason to know that the residence had no back door, which is evidenced by the fact that Agent Kipler ran around to the back of the house as soon as Flynn called out:  "Gone to the back of the house.  With the gun."  (See Audio Transcript at 1 (ECF No. 29-5) & Video Recording (ECF No. 29-7).)  Second, it would have been objectively reasonable to believe that Begin might escape through a window or through the garage.  Accordingly, the officers were reasonable in believing that Begin might escape when he turned away from the front door and ran to the back of the residence.

law, they are nevertheless entitled to immunity under the third prong of the qualified immunity inquiry because from an objective standpoint they reasonably believed in the existence of exigent circumstances.  See Estate of Bennett, 548 F.3d at 170 (citing Buchanan v. Maine, 469 F.3d 158, 170 (1st Cir. 2006); Hegarty v. Somerset County, 53 F.3d 1367, 1374-79 (1st Cir. 1995)).

>        c)        Deadly Force

Whether an officer's use of deadly force violates an individual's Fourth Amendment rights is determined by considering whether the officer's conduct was "objectively reasonable." See Berube v. Conley, 506 F.3d 79, 82-83 (1st Cir. 2007) (citing Graham v. Conner, 490 U.S. 386, 397 (1989)).  An officer's conduct is objectively reasonable when the officer has "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."  Berube, 506 F.3d at 83 (internal citation omitted).  This objective standard of reasonableness "is comparatively generous to the police in cases where potential danger, emergency conditions or other exigent circumstances exist."  Roy v. Inhabitants of City of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994).  Moreover, "[t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Asociacion De Periodistas, 680 F.3d at 81 (internal citations and quotations omitted).  Indeed, the "calculus of reasonableness must make allowance for the need of police officers to make split second judgments – in circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary in a particular situation."  Berube, 506 F.3d at 83 (internal citations and quotations omitted).

The combination of the qualified immunity and Fourth Amendment reasonableness standards "serves to protect officers from their reasonable mistakes."  Asociacion De Periodistas, 680 F.3d at 81 (internal citation omitted).  As the Supreme Court has stated, "[q]ualified

immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." Id. (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004)). If, for example, "an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, … the officer would be justified in using more force than in fact was needed." Id. (quoting Saucier, 533 U.S. at 205). Applying this standard, the Court's "ultimate inquiry" is "whether a reasonable factfinder could conclude that the defendant's conduct was so deficient that no reasonable officer could have made the same choices under the circumstances." Estate of Bennett, 548 F.3d at 168.

Against this legal backdrop, Plaintiff makes a variety of arguments for why the use of deadly force was unreasonable and therefore a violation of Begin's Fourth Amendment rights. Plaintiff asserts that the use of deadly force was unreasonable because: the officers used disproportionate force against Begin, the officers made no reasonable efforts to allow Begin to surrender, Begin did not take any violent action against the officers, and Begin did not pose an immediate threat of injury to the officers. Moreover, Plaintiff contends that summary judgment is inappropriate because many trialworthy issues of material fact remain. Defendants dispute these assertions, forcefully contend that the officers' use of deadly force was reasonable, and assert that summary judgment is warranted.

While the result here is tragic, taking the facts in the light most favorable to Plaintiff, the Court cannot conclude that the officers' actions were so deficient that no reasonable officer in their position would have made the same choices under the circumstances. Nor can the Court conclude, based on the record before it, that there are material issues of fact precluding summary judgment. The record before the Court establishes that the officers arrived at Begin's residence on the morning of April 23, 2010 because they had probable cause to arrest him on a variety of

criminal charges stemming from the fact that Begin had threatened to kill Sandra, Jesse, and Erin while pointing a high-powered rifle at them and that Begin had grabbed Jesse by the throat and thrown him up against a wall.[16]   The record also establishes that the officers had reason to believe that Begin was hostile towards them – based on the fact that Jesse had told Trooper Flynn that Begin had threatened Jesse because he believed that Jesse might report him to the police.   Furthermore, after arriving at the front door, Flynn and Begin spoke through the closed door, and Flynn had reason to believe that Begin had a loaded rifle by his side during the conversation.   Suddenly, in the middle of the exchange at the front door, Begin grabbed his gun and ran to the back of the house, measurably escalating the tension and the officers' apprehension of danger.   Indeed, Begin could have been attempting to escape or attempting to take up an offensive position against the officers.   By the time the officers were inside the residence, they were positioned at the opposite end of a hallway from Begin, who had a rifle in his hands.   Trooper Flynn repeatedly told Begin to drop the gun and show the officers his hands, but Begin refused.   Contrary to Plaintiff's assertions, the officers repeatedly offered Begin an opportunity to surrender, but Begin failed to do so.   Instead, Begin ignored Flynn's demands and held onto his gun for a substantial amount of time while partially hiding behind a wall.   Partially hiding behind the wall, Begin's gun was not pointed at the officers, but at some point Begin put both his hands on the rifle and started to turn in the direction of the officers.   At that moment, Trooper Flynn began firing at Begin, and Agent Kipler commenced firing almost immediately thereafter.

---

[16] Plaintiff's contention that Begin had not committed a sufficiently serious offense to justify the officers' arrest is simply unfounded.   Trooper Flynn had ample probable cause for arresting Begin.   To the extent Plaintiff argues that Begin's alleged criminal activity did not justify the use of deadly force, such an argument misses the mark.   The officers used deadly force against Begin because they reasonably believed that Begin presented an imminent threat of serious bodily injury.

21

As the First Circuit has made clear, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. at 176.  Applied to the case at hand and the record before the Court, this calculus of reasonableness dictates that an objectively reasonable officer in the situation facing Flynn, Kipler, and Romann could have felt at risk of serious bodily harm and believed deadly force to be necessary and lawful, and that is sufficient to legitimize the officers' use of deadly force.[17]  See id. (internal citations omitted).  Neither the fact that the officers used disproportionate force in response to the threat presented by Begin nor the possibility that the officers might have used safer procedures changes the reasonableness calculus.  That the officers potentially could have used tear gas, called for backup from other law enforcement agencies, employed a negotiator, or simply waited for the situation to calm down, as Plaintiff suggests, does not render the use of deadly force unreasonable.  As the First Circuit has stated, deadly force is not unreasonable because an officer fails to "perfectly calibrate the amount of force required to protect herself." Berube, 506 F.3d at 85.  Furthermore, in undertaking its reasonableness calculus, the Court is conscious that it is examining reasonableness "in calm retrospection," Asociacion De Periodistas, 680 F.3d at 83, from "the peace of a judge's chambers," Graham, 490 U.S. at 396, and that it must allow for the fact that the officers were forced to make split-second judgments in dark quarters while facing tense, uncertain, and rapidly evolving circumstances.  See id. at 396-97.

---

[17] Plaintiff's contention that the officers' use of deadly force was unreasonable because Begin took no violent action against them is beside the point.  The standard is whether the officers reasonably believed that Begin presented an imminent threat of serious injury – whether or not Begin took violent action against the officers is not determinative of reasonableness.

Nor does the fact that Flynn and Kipler fired a second round of shots at Begin change the Court's conclusion that the officers did not act unreasonably.  In Berube v. Conley, the First Circuit ruled that the actions of an officer who continued to fire at a suspect after he fell to the ground could not be found unreasonable because the officer failed to employ just the amount of force necessary to protect herself and no more.  506 F.3d at 85.  The officer made "a split second judgment in responding to an imminent threat," the Court of Appeals noted, and while it "might regret the officer's failure to stop shooting as soon as [the suspect] went down, immunity encompasses mistaken judgments."  Id. (internal citations and quotations omitted).  In the context of a tense and dangerous situation, Trooper Flynn and Agent Kipler reasonably could have believed that Begin posed a continuing threat and that their safety required that they continue firing.  Indeed, the officers could not see both of Begin's hands and they could not determine whether Begin was still holding the gun or whether it was a safe distance away from him.

Finally, the Court disposes of Plaintiff's three remaining arguments that the officers were unreasonable in their use of deadly force.  First, Plaintiff's contention that the CBP agents did not have authorization to act like police officers is not supported by the factual record, and, even if it were true, it would not change the Court's reasonableness analysis.[18]  Assuming arguendo that CBP agents Kipler and Romann were not authorized to arrest Begin, the agents did not in fact arrest Begin – Flynn took the lead in attempting to arrest Begin.  And in the confrontation with Begin the officers reasonably believed that they were under the imminent threat of significant bodily harm, which justified Agent Kipler's use of deadly force.  Indeed, even if the Court treats Agent Kipler simply as a private person assisting an officer with an arrest, Agent

---

[18] Plaintiff relies on inadmissible hearsay to support her contention that because CBP agents Kipler and Romann had not taken courses at the Maine Criminal Justice Academy they were not authorized to participate in Begin's arrest.

Kipler complied with Maine law governing a private person's use of deadly force when that private person has been directed by a law enforcement officer to effectuate an arrest.  See 17-A M.R.S.A. § 107(3)(B) (private person's use of deadly force justified when the person "reasonably believes such to be necessary for self-defense or to defend a 3rd person from what the private person reasonably believes to be the imminent use of unlawful deadly force").  Second, Plaintiff is simply incorrect in arguing that the officers failed to follow Maine State Police procedures (see ECF No. 37-3) in using deadly force against Begin.  Assuming that the procedures provided by Plaintiff are valid, admissible, and applicable to the officers, Plaintiff still fails to make out any violation of the procedures.[19]  Third, Plaintiff's argument that Trooper Flynn's animus towards Begin caused him to unreasonably use deadly force is unsupported by the factual record.  Flynn had probable cause to effectuate an arrest of Begin.  Based on the circumstances surrounding the standoff – including, Flynn's numerous warnings that Begin show his hands and drop his gun, Flynn's clear instructions that Begin surrender, Begin's refusal to comply with Flynn's instructions, and Begin's continued possession of this rifle – it is clear from an objective standpoint that Flynn did not act unreasonably in using deadly force against Begin.

Accordingly, because a reasonable factfinder must conclude that Begin's shooting, while grievous, "was not the result of plain incompetence or knowing violation of law on the part of the officers, the officers are entitled to qualified immunity…."  Estate of Bennett, 548 F.3d at 176.

---

[19] Nor does Plaintiff cite a specific procedure that Defendants allegedly violated.

### B.      Common Law Battery Claim

Count III of Plaintiff's Complaint asserts common law battery claims against Trooper Flynn, the CBP, and the United States.[20]  Defendants contend that Trooper Flynn is entitled to immunity from tort under Maine law, that the CBP is not a proper party under the Federal Tort Claims Act, and that the United States is entitled to summary judgment because the federal officers – Agents Kipler and Romann – did not use excessive force against Begin.

The Maine Tort Claims Act provides absolute immunity from civil liability for claims arising out of the conduct of state employees performing discretionary functions in the course and scope of their employment.  See 14 M.R.S.A. § 8111(1); see also Moore v. City of Lewiston, 596 A.2d 612, 615 (Me. 1991).  The only exception to this statutory grant of immunity is for intentional acts or omissions undertaken in "bad faith."  See id. at § 8111(1)(E).  In this case, it is clear that Trooper Flynn was exercising a discretionary function when he used deadly force against Begin on April 23, 2010.  Furthermore, on the record presented, there is no issue of material fact as to whether Trooper Flynn acted in "bad faith"; the record clearly demonstrates that Trooper Flynn was not unreasonable in his use of deadly force and that he did not act in bad faith.  Accordingly, Trooper Flynn is entitled to summary judgment with regard to Plaintiff's common law battery claim.

With regard to Plaintiff's battery claim against the CBP, the Court must dismiss the claim because under the Federal Tort Claims Act, ("FTCA"), 28 U.S.C. § 2679 et seq., the CBP is not a proper defendant.  Plaintiff's state law battery claim against the CBP, a federal government agency, may only be brought within the scope of the FTCA; otherwise, as a federal government agency, the CBP would enjoy sovereign immunity.  The FTCA acts as a waiver of the United

---

[20] On Defendant's unopposed motion, the United States replaced Agents Kipler and Romann on Counts II and III. See supra note 1.

States' sovereign immunity in state law tort actions, but it is the exclusive mechanism providing waiver of immunity for these actions against federal government agencies and employees.  See 28 U.S.C. §§ 2679(a), (b)(1).  Moreover, while the FTCA is a limited waiver of the United States' immunity, it does not waive the sovereign immunity of federal government agencies.  See §§ 1346(b), 2679(a).  It is the United States and not the responsible agency or employee that is the proper defendant in a FTCA suit.  See Allgeier v. United States, 909 F.2d 869, 871 (6th Cir. 1990) (citing 28 U.S.C. § 2679(a)).  "Thus, an FTCA claim against a federal agency or employee as opposed to the United States itself must be dismissed for want of jurisdiction."  Galvin v. Occupational Safety & Health Admin., 860 F.2d 181, 183 (5th Cir. 1988) (internal citations omitted).

Finally, the Court considers Plaintiff's common law battery claim against the United States.  The FTCA provides a limited waiver of the sovereign immunity of the United States for torts committed by federal employees acting within the scope of their employment.  Under the statute, the United States may be held civilly liable "in the same manner and to the same extent as a private individual under like circumstances."  Santoni v. Potter, 369 F.3d 594, 602 (1st Cir. 2004) (quoting 28 U.S.C. § 2674).  While certain types of intentional torts are exempted from the FTCA's waiver of sovereign immunity, the statute allows claims against the United States for common law battery arising out of "acts or omissions of investigative or law enforcement officers of the United States Government."  See id. (quoting 28 U.S.C. § 2680(h)).  Because the alleged tortious conduct occurred in Maine, the Court looks to Maine tort law in determining the United States' liability under the FTCA.  See id. (citing 28 U.S.C. § 1346(b)(1)).  Under Maine law, the tort of battery by a law enforcement officer requires "either a false arrest or the use of excessive force during or after taking an individual into custody."  See id. at 603 (citing Bale v.

Ryder, 290 A.2d 359, 360 (Me. 1972)).  As the Court has already concluded, *supra*, the officers did not use excessive force against Begin; accordingly, the officers – specifically, Agents Kipler and Romann – did not violate Maine law during the confrontation with Begin.  Because Agents Kipler and Romann did not use excessive force against Begin, there is no basis for finding liability for battery.  Therefore, summary judgment in favor of the United States is appropriate as to Plaintiff's battery claim.

## IV.     CONCLUSION

For the reasons just explained, the Court GRANTS Defendants' Motion to Dismiss and for Summary Judgment (ECF No. 28).  Judgment shall enter in favor of Defendants on all counts.


            SO ORDERED.

                                            /s/ George Z. Singal
                                            United States District Judge

Dated this 2nd day of July, 2012.